JH

IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | No. 05c 0208 |
| Plaintiff, | ) ) | Honorable James B. Zagel |
| v. | ) ) | Magistrate Martin C. Ashman |
| SIDLEY AUSTIN BROWN & WOOD LLP, | ) ) ) | |
| Defendant. | ) | |

FILED

APR 2 7 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT ON CLAIMS FOR INDIVIDUAL RELIEF**

665766

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ...................................................................................................................1

PRINCIPAL AUTHORITIES ................................................................................................1

SUMMARY OF ARGUMENT ..............................................................................................2

RELEVANT BACKGROUND ..............................................................................................3

ARGUMENT ...........................................................................................................................5

I.    Because No Individual Filed A Timely Charge Of Discrimination, *North Gibson*
Requires Dismissal Of The EEOC's Prayer For Individual Relief .......................................5

    A.    *North Gibson* Is Based On The "Distinctive Enforcement Scheme" Of The
ADEA. .......................................................................................................................5

    B.    The Genesis Of And Compelling Reasons For The *North Gibson* Rule. .................9

        1.    *EEOC v. U.S. Steel* (3d Cir. 1990). ...............................................................9

        2.    *EEOC v. Harris Chernin* (7th Cir. 1993). ...................................................10

        3.    *North Gibson* Inevitably Follows From *U.S. Steel* and *Harris
Chernin*. .......................................................................................................11

        4.    In Any Event, Even Without Considering Precedent, The *North
Gibson* Rule Would Be Needed To Make EEOC Enforcement
Consistent Under Its Three Statutes And To Fulfill Congress'
Plain Intent That Employers Not Be Subject To Long Periods Of
Open-Ended Liability. ....................................................................................12

II.    *North Gibson* Not Only Survives, But Is Reinforced By, The Opinion In *Waffle
House*. ...............................................................................................................................15

    A.    *Waffle House* Says Nothing About The ADEA, *North Gibson*, Or *Harris
Chernin*. ..................................................................................................................15

    B.    That *Waffle House* Described The EEOC As "Not Merely A Proxy" And
"Not Stand[ing] In The Employee's Shoes" Does Not Undermine *North
Gibson*. ....................................................................................................................16

| | C. | *Waffle House* Explicitly Stated That Its Holding Did Not Bear On The Validity Of Claims Or Appropriateness Of Relief Sought By The EEOC For Individuals, The Exact Subject Of *North Gibson.* | 17 |
| | D. | *Waffle House* Can Best Be Understood As A Case Limiting The Ability To Impose Arbitration On An Unwilling Party, A Problem That Has Occupied The Supreme Court For A Quarter Century. | 18 |
| III. | | The Seventh Circuit's Decision In *BOR* Turned On Quasi-Constitutional Federalism Concerns Having No Relevance To *North Gibson.* | 19 |
| | | CONCLUSION | 21 |

665-6x6

## TABLE OF AUTHORITIES

## CASES

*Alden v. Maine*,
527 U.S. 706, 199 S. Ct. 2240 (1999)...........................................................................21

*In re Bemis Co., Inc.*,
279 F.3d 419 (7th Cir. 2002) ......................................................................................21

*Board of Trs. of Univ. of Alabama v. Garrett*,
531 U.S. 356, 121 S. Ct. 955 (2001).......................................................................20, 21

*EEOC v. Board of Regents of the Univ. of Wisconsin Sys.*,
288 F.3d 296 (7th Cir. 2002) ........................................................................................1

*EEOC v. Copello*,
No. 02 C 3768, 03 C 2293, 2004 WL 765891 (N.D. Ill. April 7, 2004) ...........1, 12, 14

*EEOC v. Harris Chernin Inc.*,
10 F.3d 1286 (7th Cir. 1993) ................................................................................. *passim*

*EEOC v. Harvey L. Walner & Assocs.*,
91 F.3d 963 (7th Cir. 1996) .....................................................................................7, 8

*EEOC v. Kidder, Peabody & Co.*,
156 F.3d 298 (2d Cir. 1998)........................................................................................17

*EEOC v. North Gibson Sch. Corp.*,
266 F.3d 607 (7th Cir. Sept. 11, 2001) ................................................................. *passim*

*EEOC v. Sidley Austin Brown & Wood*,
315 F.3d 696 (7th Cir. 2002) ........................................................................................4

*EEOC v. U.S. Steel Corp.*,
921 F.2d 489 (3d Cir. 1990)................................................................................. *passim*

*EEOC v. Waffle House, Inc.*,
534 U.S. 279, 122 S. Ct. 754 (Jan. 15, 2002) ....................................................... *passim*

*General Dynamics Land Sys., Inc. v. Cline*,
540 U.S. 581, 124 S. Ct. 1236 (2004)...........................................................................5

*General Telephone Co. of Northwest v. EEOC*,
446 U.S. 318 (1980)...............................................................................14, 16, 17, 21

665766

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
473 U.S. 614, 105 S. Ct. 3346 (1985)..........................................................................19

*Trans World Airlines, Inc. v. Thurston*,
469 U.S. 111, 105 S. Ct. 613 (1985)..............................................................................5

*United States v. Kubrick*,
444 U.S. 111, 100 S. Ct. 352 (1979).............................................................................14

*Vines v. University of Louisiana at Monroe*,
398 F.3d 700 (5th Cir. 2005) .........................................................................1, 7, 8, 17

*Volt Info. Scis., Inc. v. Board of Trs. of the Leland Stanford Junior Univ.*,
489 U.S. 468, 109 S. Ct. 1248 (1989)..........................................................................19

## STATUTES

42 U.S.C. § 2000e-5.........................................................................................................7

42 U.S.C. § 2000e-5(f)(1)................................................................................................6

29 C.F.R. § 1626.19..........................................................................................................7

29 C.F.R. §§ 1626.5-1626.11...........................................................................................4

29 U.S.C. § 626(c)(1)........................................................................................................7

29 U.S.C. § 626(d)............................................................................................................6

29 U.S.C. § 626(e) ...........................................................................................................6

Fed. R. Civ. P. 16..............................................................................................................1

Fed. R. Civ. P. 23.............................................................................................13, 16, 21

## **INTRODUCTION**

Defendant ("Sidley") and Plaintiff ("EEOC") conferred pursuant to Fed. R. Civ.

P. 16 and determined that the parties would benefit from an early decision on a pure question of

law under the Age Discrimination in Employment Act of 1967 ("ADEA"): Is EEOC v. North

Gibson Sch. Corp., 266 F.3d 607 (7th Cir. Sept. 11, 2001) ("North Gibson") still good law, as

Sidley contends, or was it overruled *sub silento* by EEOC v. Waffle House, Inc., 534 U.S. 279,

122 S.Ct. 754 (Jan. 15, 2002) ("Waffle House"), as the EEOC contends?  To put it another way,

if individuals fail to file timely charges under the ADEA, and would thus have their claims

dismissed if they sued for themselves, may the EEOC nevertheless seek individual relief on their

behalf?

Although this issue is a purely legal one, to set it up procedurally, Sidley has

moved for summary judgment on the EEOC's prayer for relief C (seeking individual relief).

## **PRINCIPAL AUTHORITIES**

In their arguments the parties will be referring repeatedly to five cases in addition

to Waffle House and North Gibson:  (i) the main case North Gibson relied on, EEOC v. Harris

Chernin Inc., 10 F.3d 1286 (7th Cir. 1993) ("Harris Chernin"); (ii) the main case Harris Chernin

relied on, EEOC v. U.S. Steel Corp., 921 F.2d 489 (3d Cir. 1990) ("U.S. Steel"), a case cited in

Waffle House as an example of a correct ruling; (iii) a case decided after Waffle House in which

Judge Leinenweber relied on North Gibson as valid law, EEOC v. Copello, No. 02 C 3768,

03 C 2293, 2004 WL 765891 (N.D. Ill. April 7, 2004) ("Copello"); (iv) a case decided after

Waffle House and treating its holding as limited, a case in other words consistent with Sidley's

view, Vines v. University of Louisiana at Monroe, 398 F.3d 700 (5th Cir. 2005) ("Vines"); and

(v) EEOC v. Board of Regents of the Univ. of Wisconsin Sys., 288 F.3d 296 (7th Cir. 2002)

("BOR"), which the EEOC contends supports its view of Waffle House.

## SUMMARY OF ARGUMENT

In North Gibson, the Seventh Circuit held that the EEOC may not recover individual relief under the ADEA where none of the alleged victims had filed a timely charge of discrimination. North Gibson is based on what its author, Judge Ripple, called the "distinctive enforcement scheme" of the ADEA, *i.e.*, the ways in which the ADEA differs from the two other statutes enforced by the EEOC – the 1990 Americans With Disabilities Act ("ADA") and Title VII of the 1964 Civil Rights Act ("Title VII"). The "distinctive enforcement scheme" of the ADEA was held in U.S. Steel, Harris Chernin, and North Gibson to create a unique "representative" relationship (also referred to as a "privity" or a "standing in the shoes" relationship) between the EEOC and individuals on whose behalf it seeks individual ADEA relief. (See I.A., below.) Unless individual relief is tethered to a valid charge by an individual or the EEOC, as required by North Gibson, the EEOC would be free to contend that there is no statute of limitations for individual relief allowing it, as here, to seek such relief as far back as 1978.

Thus, this trio of cases, and particularly North Gibson, serve public policy and effect Congressional intent. Judge Leinenweber, following North Gibson in 2004, eloquently defended its general principles and elucidated its purposes in a case decided against the same EEOC office and lawyers as in this case, who made analogous arguments there. (See I.B.4, below.)

Waffle House held that an arbitration agreement with an individual cannot prevent the EEOC from suing in federal court to secure relief for the individual unless the EEOC is a party to the agreement. Since only the ADA was involved, Waffle House had no reason, nor did it purport, to discuss the ADEA's "distinctive enforcement scheme," or whether that supported the ADEA rule of North Gibson. In fact, the Waffle House majority went out of its

- 2 -

way (adding part V for this purpose) to make clear that its rationale did *not* go to the "validity of any claim" or the "appropriate[ness]" "of any relief." Waffle House did not purport to overrule North Gibson or Harris Chernin, nor did it even cite those cases. Waffle House cited U.S. Steel, the seminal case that led to North Gibson and Harris Chernin, as an example of a case with continuing validity. Waffle House can best be understood as an arbitration case that left undisturbed preexisting law on EEOC powers. (See II, below.)

BOR considered whether sovereign immunity bars a discrimination suit against a state. BOR, like earlier sovereign immunity cases, makes clear such cases turn on unique considerations related to federalism and the Constitution which override mere concerns of statutory construction. BOR has little relevance here. (See III, below.)

Since all individual claims here are time-barred, the EEOC prayer for relief C, seeking individual relief, should be dismissed with prejudice.

## RELEVANT BACKGROUND

In September/October 1999, Sidley asked 32 of its partners to relinquish their partnership status and remain at the firm as "counsel" rather than partners. Of these, 12 were 48 years old or younger.[1] None of the 32 has ever filed an EEOC charge against Sidley alleging age discrimination.

More than seven months after media reports of Sidley's decision, the EEOC's Chicago office *sua sponte* initiated an investigation into Sidley's "compliance" with the ADEA. On July 5, 2000, the EEOC District Director notified Sidley in writing that "the Commission is investigating your organization in order to determine its compliance status with the ADEA."

---

[1]     One affected individual, age 35, falls outside the ADEA and the EEOC's jurisdiction.

(Ex. A, p. 1.) The letter otherwise made no allegations, accusations, findings or conclusions. Id. Attached to the letter were 29 requests for information. Id.

Sidley began supplying information informally, but took the position that "coverage" (that is, whether law firm partners were "employees" within the meaning of the ADEA) should be decided before Sidley was required to turn over information on other issues. Disagreeing, the EEOC in October 2001 issued a subpoena and, two months later, moved to enforce the subpoena on the ground that Sidley was not providing enough information to allow the EEOC to determine if a violation occurred. The District Court agreed with the EEOC, ordering full compliance. The Seventh Circuit ultimately reversed that ruling in part, agreeing with Sidley on this issue. EEOC v. Sidley Austin Brown & Wood, 315 F.3d 696 (7th Cir. 2002) (requiring Sidley to produce initially only documents in its possession relating to the limited question of whether the 32 former partners were covered "employees").[2]

During proceedings on the subpoena, the EEOC made statements that led Sidley's Counsel to send a letter on December 20, 2001 (Ex. B) asking whether anyone had filed a "charge of discrimination" (a term the EEOC defines in 29 C.F.R. §§ 1626.5-1626.11 as a "writing [which] . . . *shall* generally allege the discriminatory acts(s)" with "a clear and concise statement *of the facts, including pertinent dates, constituting the alleged unlawful employment practices,*" of which the EEOC "shall promptly notify the respondent").[3] The EEOC responded

---

[2] The majority opinion pointed out that "we think the district court acted prematurely in ordering the subpoena complied with in its entirety," reasoning that "[w]ithout having proposed a standard or criterion to guide the determination, the Commission has not earned the right to force the law firm not merely to finish complying with the coverage portion of the subpoena but to go on and produce the voluminous and sensitive documentation sought relating to the question whether, if these 31 partners were employees, they were demoted on account of their age and therefore in violation of the age discrimination law." 315 F.2d at 707.

[3] Unless otherwise stated, all emphasis added throughout.

- 4 -

on December 27 (Ex. C) that "[n]o partner or former partner of Sidley & Austin has yet filed a charge of discrimination" (as of a time more than two years after the 1999 events now at issue).

After the Seventh Circuit ruling in October 2002, the EEOC never went back to the district court to establish its entitlement to merits discovery. Twenty months later, on July 15, 2004, the Chicago office issued a "determination letter" stating that Sidley had violated the ADEA. Thereafter, the EEOC initiated conciliation proceedings (required after a determination is made). After the EEOC deemed those concluded, despite a proposal from Sidley addressing all of the issues raised by the EEOC, it filed this suit on January 13, 2005, seeking (in prayer for relief C) monetary relief and reinstatement for not only the 32 individuals but also for individuals it claims were affected by an alleged mandatory retirement policy going back to 1978, the inception of EEOC jurisdiction over the ADEA.

## ARGUMENT

### I. Because No Individual Filed A Timely Charge Of Discrimination, *North Gibson* Requires Dismissal Of The EEOC's Prayer For Individual Relief.

#### A. *North Gibson* Is Based On The "Distinctive Enforcement Scheme" Of The ADEA.

Enacted in 1967, the ADEA incorporated remedial provisions from the Fair Labor Standards Act ("FLSA") and gave enforcement power to the Department of Labor, which administered the FLSA. General Dynamics Land Svs., Inc. v. Cline, 540 U.S. 581, 591 n.4, 124 S.Ct. 1236, 1242 n.4 (2004). The initial ADEA statute of limitations, borrowed from the Portal to Portal Act (ancillary to the FLSA and also administered by the Department of Labor), was 3 years for cases alleging willful violations and 2 years for all other cases. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 127, 105 S.Ct. 613, 625 (1985). The ADEA did not initially subject plaintiffs to the administrative requirements of Title VII, which was enforced by the EEOC.

- 5 -

In 1978, Congress transferred ADEA enforcement power to the EEOC and added to the ADEA the rule (borrowed from Title VII) that individual claims would be barred for any individual not filing a charge of discrimination with the EEOC within either 180 or 300 days, depending on whether the claim was filed in a "deferral state." See 29 U.S.C. § 626(d) (in Illinois, the 300-day period applies). The 1978 amendment did *not* repeal the ADEA's original 2 and 3 year statutes of limitations. Under the ADEA alone, then, from 1978 to 1991, claimants could be time-barred if they took more than *either* 180 (or 300) days to file a charge of discrimination *or* 2 (or 3) years to file a lawsuit.

To allow ADEA litigants to comply with the 2 or 3 year statute of limitations even if the EEOC moved slowly, the ADEA allowed an individual to sue 60 days after a charge was filed even if the EEOC had not made a decision by then. 29 U.S.C. § 626(d). Title VII and the ADA have never had counterpart statutes of limitations or counterpart provisions allowing suit within 60 days. Under those statutes, claimants must wait until the EEOC terminates its investigation and issues a "right to sue letter," no matter how long that takes, and then have 90 days to sue. 42 U.S.C. § 2000e-5(f)(1).

In 1991, Congress amended the ADEA to make it more closely resemble Title VII and the ADA. The amendment eliminated the 2-3 year statutes of limitations and required suits to be filed no later than 90 days after the termination of an EEOC investigation. See 29 U.S.C. § 626(e). But the 1991 amendment did not eliminate the 60-day "opt-out" period (still unavailable under Title VII and the ADA), 29 U.S.C. § 626(d), so that ADEA claimants uniquely do not need to wait for a "right to sue" letter before filing suit. This history, and its residual 60-day "opt out" right, is the first way ADEA plaintiffs differ from ADA and Title VII plaintiffs.

More important for present purposes is another difference: Under Title VII and the ADA, the EEOC has no jurisdiction to investigate, conciliate, or bring an enforcement action absent the filing of a charge of discrimination. See 42 U.S.C. § 2000e-5. The ADEA uniquely allows the EEOC to act without any individual first filing a charge of discrimination. 29 CFR § 1626.19 ("The right of the Commission to file a civil action under the ADEA is not dependent on the filing of a charge.") Since charges must be filed promptly (180 or 300 days) and are needed to give jurisdiction to the EEOC under Title VII and the ADA, those two statutes contain a limitation on stale claims not present in the ADEA.

Finally, and also important for present purposes, is a third difference in the ADEA. As soon as the EEOC elects to pursue an enforcement action under the ADEA, an individual claimant loses his right to pursue a private cause of action in federal court. 29 U.S.C. § 626(c)(1) ("Any person aggrieved may bring a civil action . . . *Provided*, [t]hat the right of any person . . . shall terminate upon the commencement of an action by the [EEOC]") (emphasis in original); Vines, 398 F.3d at 707 ("ADEA terminates the right of an individual to pursue an action once the EEOC commences an action to enforce the employee's rights"). In contrast, under Title VII and the ADA, suit by the EEOC does *not* terminate an employee's right to pursue a private claim, either in connection with a previously filed suit or by intervening in the EEOC's litigation. Id.

Title VII cases like EEOC v. Harvey L. Walner & Assocs., 91 F.3d 963, 968-69 (7th Cir. 1996) ("Harvey L. Walner"), reason that *because* Title VII claimants "retain the right to seek relief in federal court," a right not possessed by ADEA claimants, the EEOC under Title VII "is not merely a proxy for the victims of discrimination." (We will return to this issue and the use of the "not a proxy" metaphor.)

- 7 -

These last two differences – the EEOC can proceed without a charge and, when it does proceed, the claimant loses his right to pursue a private action – have led courts to conclude that, uniquely under the ADEA, the EEOC acts as a "representative" of an individual for whom the EEOC seeks individual relief. The leading case for this proposition is U.S. Steel, 921 F.2d at 494-95 (ADEA enforcement scheme is different from Title VII and "*Congress* would not have crafted this enforcement scheme . . . unless [it] *intended for the EEOC to serve as the individual's representative when it seeks to enforce that individual's rights*"). U.S. Steel was cited in Waffle House as an example of a correctly reasoned case on this exact point. See below, p. 18; see also Vines, 398 F.3d at 708 (holding after Waffle House that the EEOC has "representative responsibilities when it seeks private benefits for an individual").

The EEOC, as an individual's "representative," is subject to some (but not all) defenses and rules that would apply if an individual brought his or her own suit. Courts holding the EEOC subject to such defenses and rules tend to cite U.S. Steel and say that the EEOC "stands in the shoes" of, is "in privity with," or is a "representative of" the individual. (See below, pp. 10-12, 17.) When holding the EEOC not subject to defenses and rules that apply to individuals, the courts tend to echo Title VII cases like Harvey L. Walner (see above, p. 7) and say that the EEOC is "not a proxy" for the individual. These doctrines (or metaphors) are not inconsistent, but complementary, as shown by the fact they have coexisted for decades and were both reaffirmed in part V of Waffle House (discussed below at pp. 17-18). The question in ADEA cases for individual relief is therefore not whether the EEOC is a "representative" or "not a proxy," but which doctrine should be applied to a specific situation. We submit that one focusing on the substance of the holdings, and not distracted by the metaphors, will find that the holdings generally make sense and can be readily reconciled.

- 8 -

**B.     The Genesis Of And Compelling Reasons For The _North Gibson_ Rule.**

Viewed against this backdrop, the North Gibson rule can readily be seen as a logical, maybe even inevitable, result of analyzing the implications of the ADEA's "distinctive enforcement scheme." 266 F.3d at 615. Since the ADEA limits claimants' rights to pursue their own actions and allows the EEOC to bring such actions without the individual's permission, if there were no limits imposed on the EEOC when it sought individual relief, the EEOC would have extreme powers under the ADEA to bring otherwise barred claims going back to 1978 (as it attempts to do in this case) at any time. Moreover, the 1978 date would control in 2020 as much as it did in 1979, resulting in a completely open-ended "limitations" period. Of the many decisions rejecting attempts by the EEOC to push its powers to such extreme limits, two – U.S. Steel and Harris Chernin – most plainly underlie the rule in North Gibson.

**1.     _EEOC v. U.S. Steel_ (3d Cir. 1990).**

U.S. Steel is of particular importance for the question raised in this motion because it is cited as an example of a continuing valid authority by Waffle House (see below, p. 18). In other words, the EEOC argument that Waffle House overrules North Gibson must contend with the obvious fact that Waffle House reaffirms U.S. Steel. In U.S. Steel, several individuals initiated private actions under the ADEA and either lost or settled. 921 F.2d at 491. (Recall that, uniquely under the ADEA, individuals can initiate private actions before the EEOC finishes its investigation.) After the individuals ended their cases, the EEOC began a similar case to obtain the relief the first case had not given them. The district court allowed the EEOC to do this and awarded the individuals monetary damages. Id. Defendant appealed in part on the grounds that, by virtue of the earlier suits, the EEOC's claim for monetary relief was barred by _res judicata._

- 9 -

The Third Circuit agreed with defendant and rejected the EEOC's position,

emphasizing the "distinctive enforcement scheme" of the ADEA which placed the EEOC "in

privity" with individual claimants for purposes of an EEOC suit for individual relief:

> The distinctive enforcement scheme of the ADEA shows unmistakably
> that the EEOC has representative responsibilities when it initiates
> litigation to enforce an employee's rights . . . We are convinced that
> Congress would not have crafted this enforcement scheme – on the one
> hand, creating an individual cause of action and, on the other, cutting off
> the individual's right to sue once the EEOC begins its action – unless
> Congress intended for the EEOC to serve as the individual's
> representative when it seeks to enforce that individual's rights . . . [T]he
> conclusion that the EEOC is the individual's representative in ADEA
> suits, like the one before us here seems inescapable.

Id. at 494-95. The court rejected the EEOC's argument that it was not "in privity" with

individual claimants because it protected "a broader independent public interest different from

that of an individual grievant":

> While it is true that the Commission has the responsibility to protect a
> vital public interest that transcends the interests of any or all aggrieved
> individuals . . . the Commission's responsibilities *include* the
> representation of these grievants when it seeks individual relief on their
> behalf. Thus, when the Commission seeks individualized benefits under
> the ADEA . . . the Commission functions to that extent as their
> representative.

Id. at 496 (emphasis in original).

## 2. *EEOC v. Harris Chernin* (7th Cir. 1993).

Relying on U.S. Steel, and using its "privity" and "representative" analysis, the

Seventh Circuit in Harris Chernin barred the EEOC from obtaining relief for an individual whose

ADEA claim had been previously filed in court and dismissed as time-barred (under the two-year

limitations period repealed in 1991; see above, p. 6). Relying on U.S. Steel, the Seventh Circuit

held that *res judicata* barred the individual's claims when asserted by the EEOC, his

representative. Harris Chernin, 10 F.3d at 1291.

- 10 -

Both the ADEA and Title VII were at issue in <u>Harris Chernin</u>. The Seventh Circuit recognized that issues unique to each statute arose from their differing procedures and treated those issues under different subheadings (<u>id.</u> at 1289: "B. The ADEA Claim"; <u>id.</u> at 1292: "C. Title VII"). On the ADEA issue, <u>Harris Chernin</u> analyzed <u>U.S. Steel</u> at length and adopted the <u>U.S. Steel</u> holding that "when the EEOC seeks to represent grievants by attempting to obtain private benefits on their behalf, the doctrine of representative claim preclusion must be applied" because of the "privity between the EEOC and the individuals for whom it seeks individual benefits." <u>Id.</u> at 1290-91.

Importantly, <u>Harris Chernin</u> did *not* bar the EEOC's simultaneous claim for general injunctive relief "because of the difference between [the claimant's] personal interest and the public interest represented by the EEOC." <u>Id.</u> at 1291. Accordingly, <u>Harris Chernin</u> allowed the EEOC to use evidence of discrimination against the time-barred individual to support a general injunction against the defendant. This was consistent with <u>U.S. Steel</u>, where the defendant did not appeal from the general injunction, although <u>Harris Chernin</u> made this distinction explicit. By applying *both* of the coexisting doctrines (EEOC sometimes is a representative, sometimes is not a proxy), <u>Harris Chernin</u> made quite clear it recognized the doctrines were complementary, not contradictory.

### 3. *North Gibson* Inevitably Follows From *U.S. Steel* and *Harris Chernin.*

Following <u>Harris Chernin</u>, <u>North Gibson</u> barred the EEOC from obtaining individual relief for seven employees who had not filed timely charges (two filed late, five not at all). Emphasizing the "distinctive enforcement scheme" of the ADEA, under which a private litigant loses his right to sue if the EEOC sues and the EEOC can sue even if no individual files a charge, the <u>North Gibson</u> court reasoned that the EEOC necessarily "steps into the shoes of the individual" for purposes of seeking individual relief. <u>Id.</u> at 615. "It is this privity, created by the

- 11 -

ADEA's distinctive enforcement scheme," the Seventh Circuit reasoned, "that precludes the EEOC from seeking monetary relief that is not available to the individual." Id.

Because "the ADEA requires individual charges of discrimination and provides statutory periods for filing the charges," the court concluded that:

> [i]f any of the individuals from [employer] NGSC had attempted to bring suit in the district court based on untimely or nonexistent charges, the claim would have been dismissed by the district court for a failure to comply with the statutory filing requirement. At that point, the seven would be in the same position as the employee in *Harris Chernin*, and the prohibition *Harris Chernin* placed on the EEOC's subsequent relitigation of the same claims would apply squarely.

Id. at 616-17. This reference to Harris Chernin shows North Gibson recognized the anomaly any other result would create, *i.e.*, allowing the EEOC to proceed on the untimely claims would permit it to sue on behalf of people who did absolutely nothing to pursue their rights (North Gibson), but not people who (as in Harris Chernin) tried (albeit belatedly) to prosecute their claims and failed because they acted too late. Id. at 616. But the Harris Chernin rule is essentially the same as the U.S. Steel rule. Thus, North Gibson, Harris Chernin, and U.S. Steel are in essence three ways of saying the same thing. If one was not overruled by Waffle House – as U.S. Steel plainly was not – none were overruled.

### 4. In Any Event, Even Without Considering Precedent, The *North Gibson* Rule Would Be Needed To Make EEOC Enforcement Consistent Under Its Three Statutes And To Fulfill Congress' Plain Intent That Employers Not Be Subject To Long Periods Of Open-Ended Liability.

In Copello, Judge Leinenweber treated the pertinent ruling in North Gibson as valid authority after Waffle House, using it to support his ruling against the EEOC on an analogous issue. In doing so, he marshaled reasons in support of North Gibson as compelling as those the Seventh Circuit had provided. Those reasons would be enough, even if this were an

- 12 -

issue of first impression, for a court to apply the North Gibson holding and preclude the EEOC from seeking individual relief.

Copello was a Title VII, non-Rule 23 "class action." The EEOC attempted to revive stale individual claims by defining the "class" to include individuals whose time to file a charge had expired before the EEOC obtained jurisdiction (under Title VII, which requires a "charge," see above, pp. 6-7). To appreciate the extreme nature of the EEOC claim and the burden its position would impose on employers, one can note that it would empower the EEOC in 2005 to resurrect individual complaints all the way back to 1964 if a single new claimant filed a timely charge in 2005. Judge Leinenweber, recognizing the consequences of the EEOC position, limited the EEOC to representing only individuals who could still have timely filed when the EEOC received its first charge (and thereby obtained jurisdiction), *i.e.*, those discriminated against in the 300 days prior to the first charge.

In explaining why the EEOC should not be allowed to represent individuals who failed to file a timely charge before the 300-day period, Judge Leinenweber persuasively contrasted Congress' intent with the EEOC's position:

> The relatively short filing period in Title VII [and added in 1978 to the ADEA] is not by accident: Congress intended a short limitations period to encourage prompt processing and resolution of employment discrimination claims . . . When taken to its logical conclusion, the EEOC's argument would eviscerate *any* limitations period in Title VII cases, so long as the plaintiff alleges a continuing violation. Any employer accused of a continuing violation or pattern or practice hostile environment allegations faces exposure to unlimited claims from long-departed employees . . . .

Id. at *9 (emphasis in original).

The same concerns are plainly present here, where the EEOC seeks individual relief for former Sidley partners dating back to 1978 (when the EEOC first obtained jurisdiction to enforce ADEA). (Compl. ¶6(A).) But for North Gibson, the same "logical conclusion" that

- 13 -

"the EEOC's argument would eviscerate *any* limitations period" would apply to ADEA suits. Indeed, things would be even worse under the ADEA because no charge need be filed to give the EEOC jurisdiction under the ADEA, meaning it could at any time begin to investigate any suspected wrongdoing of anyone back to 1978. No possible ADEA claim could ever be considered closed under this view, even decades hence, rendering useless the 180 and 300-day time requirements so carefully elaborated by Congress.

Consider the anomaly this creates. If the EEOC is correct, then in 1979 the EEOC was able to bring claims going back only one year to 1978. In 2005, however, the EEOC could go back 27 years, still to 1978. In 2020, presumably, it could go back forty-two years. Congress hardly intended to create such an arbitrary, lengthy, and seemingly endless limitations period in the 1978 amendment which *shortened* the time to act under the ADEA from 2 (or 3) years to 180 (or 300) days (see above, pp. 5-6).

On the contrary, Congress surely recognized then, as it has repeatedly, what Judge Leinenweber quotes from United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352 (1979):

> Statutes of limitations . . . *represent a pervasive legislative judgment that it is unjust to fail to put the adversary on notice to defend within a specified period of time and that 'the right to be free of stale claims in time comes to prevail over the right to prosecute them'* . . . [T]hey protect defendants and the courts from having to deal with cases in which the search for truth may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise.

Copello, 2004 WL 765891 at *10.

Although Waffle House and BOR were decided in 2002, well before Copello, the EEOC in Copello cited no authoritative source as support for obliterating the time constraints Congress had crafted:

> Relying primarily on General Telephone [Co. of Northwest v. EEOC, 446 U.S. 318 (1980) ("General Telephone")], the EEOC claims that its ability

- 14 -

> to vindicate public rights entitles it to avoid procedural limitations that may otherwise encumber private litigants. To a certain degree, this is true. but *the EEOC does not provide any controlling authority permitting it to expand substantive rights, such as reviving stale claims . . . And the Court finds no controlling authority for the proposition that the EEOC's laudable public mandate allows it to alter substantive individual rights.*

Id. at *10.

As the first sentence in the above quotation suggests, the EEOC relied primarily on the fact that the Commission is "different because [it] is not merely a private litigant." Id. In assessing the importance of this difference. Judge Leinenweber reasoned that preventing the EEOC from resurrecting time-barred individual claims for monetary relief would do "little to frustrate the primary public purpose of the EEOC's enforcement action." Id.

## II.    *North Gibson* Not Only Survives, But Is Reinforced By, The Opinion In *Waffle House.*

Waffle House involved the limited question of whether an arbitration agreement signed by an individual. but not by the EEOC, could preclude the EEOC from pursuing relief for that individual in federal court. Waffle House: (a) says nothing about the ADEA, North Gibson, or Harris Chernin; (b) merely applies the coexisting doctrines (EEOC is a representative, but is not a proxy) assumed correct by North Gibson and Harris Chernin; (c) explicitly disclaims any intention to change existing rules, like the North Gibson rule, affecting the "validity of claims" or "appropriate[ness]" "of relief"; and (d) is better understood as a case limiting the reach of the Federal Arbitration Act ("FAA") than as a case expanding EEOC powers.

### A.    *Waffle House* Says Nothing About The ADEA, *North Gibson*, Or *Harris Chernin.*

Waffle House. decided four months after North Gibson, nowhere discusses North Gibson. Harris Chernin. or the ADEA's "distinctive enforcement scheme," while citing U.S. Steel as an example of a correctly decided case unaffected by Waffle House. (See below, p. 18.)

- 15 -

An ADA case, Waffle House was so little focused on the "distinctive enforcement scheme" of the ADEA that its crucial analysis contained the following key passage:

> [W]e are persuaded that *pursuant to Title VII and the ADA, whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action* in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, even when it pursues entirely victim-specific relief.

Waffle House, 534 U.S. at 295-96. This passage omits reference to the ADEA and, of course, one could not make such a statement about ADEA actions. Under the ADEA, the EEOC does not have to "choose[] from among the many charges filed" in bringing ADEA claims. It has much greater power to act completely on its own, part of the concern of cases like U.S. Steel.

**B.    That *Waffle House* Described The EEOC As "Not Merely A Proxy" And "Not Stand[ing] In The Employee's Shoes" Does Not Undermine *North Gibson*.**

Waffle House stated that the Commission is not merely "a proxy for the employee." 534 U.S. at 298. That statement originated 13 years before North Gibson in the much-cited General Telephone case (holding that the EEOC could represent individuals without meeting the class certification requirements of Rule 23). The Court there held: *"[T]he EEOC is not merely a proxy for the victims* of discrimination" and "[therefore its] enforcement suits should not be considered representative actions subject to [federal class action] Rule 23." 446 U.S. at 326.

The Seventh Circuit was aware of General Telephone in deciding Harris Chernin, and indeed cited General Telephone for the proposition that "[t]he EEOC has a right to sue independent of any private plaintiff's rights." Harris Chernin, 10 F.3d at 1291. The Waffle House statement that the EEOC was "not merely a proxy" of an employee thus did not change the law from the time of North Gibson (and its predecessor cases).

- 16 -

For this reason, the Fifth Circuit, following Waffle House, continued to apply the rule that the EEOC was in privity with a private ADEA claimant. See Vines, 398 F.3d at 709. The Vines' court cited for that proposition EEOC v. Kidder, Peabody & Co., 156 F.3d 298 (2d Cir. 1998), whose holding was explicitly rejected in Waffle House, noting that Kidder had been overruled by Waffle House "*on other grounds.*" In Vines, the court concluded that Kidder remained valid authority for the longstanding proposition that "the statutory enforcement mechanism of the ADEA 'gives the EEOC representative responsibilities when it seeks private benefits for an individual'." Vines, 398 F.3d at 707 (citation omitted).

In sum, then, it is important to move beyond slogans and labels to see what, substantively, Waffle House purported to decide.

## C. *Waffle House* Explicitly Stated That Its Holding Did Not Bear On The Validity Of Claims Or Appropriateness Of Relief Sought By The EEOC For Individuals, The Exact Subject Of *North Gibson.*

The class issue in General Telephone, like the arbitration issue in Waffle House, did not involve the "validity" of a claim or the "relief that could be appropriately awarded," a point the Waffle House majority relied upon in its important last part V, replying to the dissent on this exact issue. 534 U.S. at 297. Since North Gibson most clearly does involve both the "validity of a claim" (time barred claims are not valid) and the "relief that could be appropriately awarded" (individual relief is limited), North Gibson covered the very subjects the Waffle House majority explicitly said its opinion would *not* affect.

Specifically, to rebut the dissent's claim that the majority opinion was broad and radical, the majority went out of its way in part V (in *dicta*) to show the opinion's limitations by conceding that:

> *It is true,* as respondent and its *amici* [the non-prevailing parties] have argued, *that Baker's conduct may have the effect of limiting the relief that the EEOC may obtain in court* [for Baker]. If, for example, he had failed

- 17 -

> to mitigate his damages, or had accepted a monetary settlement, any
> recovery by the EEOC would be limited accordingly.

Id. at 296. The Court then cites (as examples of good law not affected by Waffle House) two

cases limiting individual relief due to failure to mitigate and a settlement (which made a case

"moot"). Next it cited U.S. Steel, reaffirming its authority in the following words:

> EEOC v. U.S. Steel Corp., 921 F.2d 489, 495 (C.A. 3 1990) (individuals
> who litigated their own claims were precluded by res judicata from
> obtaining individual relief in a subsequent EEOC action based on the
> same claims).

Id. at 297.

Part V was included precisely to recognize the continuing validity of the

unapplied half of the two coexisting rules (sometimes the EEOC is limited when it sues for

individuals, sometimes not). The Court even suggested a way of reconciling cases decided under

both rubrics, while showing what the majority viewed as the limitations of its decision in Waffle

House:

> But *no question concerning the validity of his claim or the character of
> the relief that could be appropriately awarded* in either a judicial or an
> arbitral forum *is presented by this record.*

Id. In other words, the Waffle House majority believed it was not presented with and did not

have to consider a rule (like that in North Gibson) limiting EEOC relief based on the lack of

"validity of [the] claim or the character of the relief." That is why its holding could comfortably

coexist with U.S. Steel, which did involve such matters (as does North Gibson).

### D. *Waffle House* Can Best Be Understood As A Case Limiting The Ability To Impose Arbitration On An Unwilling Party, A Problem That Has Occupied The Supreme Court For A Quarter Century.

Waffle House can best be understood as part of the ongoing quarter-century

Supreme Court debate over the scope and meaning of the FAA. The overruled Court of Appeals

decision had expressly based its view on a "balancing" of FAA policies against EEOC policies.

- 18 -

Id. at 290. Since 1978, the Supreme Court has granted certiorari no fewer than 24 times to address issues arising under the FAA. A theme in these cases is that arbitration is a matter of private contractual arrangement. See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625, 105 S.Ct. 3346, 3353 (1985) (the FAA "is at bottom a policy guaranteeing the enforcement of private contractual arrangements"); Volt Info. Scis., Inc. v. Board of Trs. of the Leland Stanford Junior Univ., 489 U.S. 468, 479, 109 S.Ct. 1248, 1256 (1989) ("Arbitration under the [FAA] is a matter of consent, not coercion").

Viewed as one in a long line of arbitration cases, Waffle House can be seen as raising the question whether to *impose* an arbitration agreement on a public agency *which did not consent* to it. 534 U.S. at 294 ("we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement"). Waffle House answered this question (did the federal government "consent" to arbitrate?) in part by noting that Congress gave the EEOC express statutory authority to "proceed in a judicial forum," which, as a non-party to the arbitration clause, it had not agreed to waive. Id. at 292.

These issues are far afield from the concerns of North Gibson. Thus, given the statute involved (the ADA) and the narrow basis for the Court's holding (that, as a non-party, the EEOC is not bound to an arbitration agreement), Waffle House cannot reasonably be read as having done something as drastic as abrogating North Gibson without even mentioning it, the statute it construed, or its well-settled rationale.

## III. The Seventh Circuit's Decision In *BOR* Turned On Quasi-Constitutional Federalism Concerns Having No Relevance To *North Gibson.*

When the parties here met to comply with Fed. R. Civ. P.16, EEOC counsel was courteous and cooperative enough to advise Sidley's counsel that the EEOC would also rely on BOR so Sidley could address the decision in this brief. We will therefore try to do so even

- 19 -

though its only relevance appears to be that it applies Waffle House, an ADA case, to the ADEA. If this is the EEOC's purpose in citing BOR, we concede the point and so the Court need not spend time on the case.

To be fair to the EEOC (which was fair to us in raising the case), we will not save our full analysis for reply. BOR involved the issue of how far sovereign immunity should protect a state sued by a federal agency. Board of Trs. of Univ. of Alabama v. Garrett, 531 U.S. 356, 121 S.Ct. 955 (2001), had just held that state agencies like the defendant in BOR were immune from *individual* discrimination suits, while suggesting in *dicta* that a suit by the EEOC would be treated differently. Relying on that *dicta*, BOR allowed the EEOC to sue a state agency for individual relief in its capacity as an agency of the federal government (which can sue states).

BOR had no reason to consider the dividing line between the ADEA doctrines at issue here – that the EEOC sometimes (but not always) "stands in the shoes" of an individual. In BOR, the individual claimants had no shoes; Garrett had made clear that individuals simply lacked the constitutional capacity to sue states under the ADA. The question in BOR was whether, as Garrett had suggested, an agency of the federal government like the EEOC could sue on an individual's claim even though the individual claimant could not. This has nothing to do with the North Gibson situation, where claimants did have the right to sue but simply failed, or chose not to, timely pursue that right. BOR concerned not the consequences of the failure of individuals to act during a time limited by Congress to enforce rights they plainly had, but a situation where the individuals had no right to do anything – the EEOC alone had such right (if anyone did).

- 20 -

BOR, in short, considered broad claims that the EEOC was entirely barred from pursuing individual relief. Had BOR gone the other way, hundreds of thousands if not millions of state employees in all discrimination cases would have had no right to sue (Garrett) or to be protected by the EEOC. North Gibson on the other hand raises no broad issue about the EEOC's right to seek individual relief; it just limits such relief to the same extent Congress did.

The BOR court (which included Judge Rovner, who was also on the Harris Chernin panel) said nothing about North Gibson, Harris Chernin, or U.S. Steel. They realized they were not faced with balancing tests regarding one type of relief under one statute, but rather with the larger question of balancing the federal government's supremacy against states' rights to operate free from federal suits, a profound and general issue with a Constitutionally-based uniqueness going back to the origins of the nation. See, e.g., Alden v. Maine, 527 U.S. 706, 755-56, 199 S.Ct. 2240, 2267 (1999).

Given such a large issue with such a rich historical context, it is no wonder BOR said nothing about North Gibson, Harris Chernin, their rationales, or the distinctions between the ADEA and other EEOC statutes.[4]

## CONCLUSION

We ask the Court to rule that North Gibson remains the law in the Seventh Circuit and, accordingly, that prayer for relief C be dismissed with prejudice.

---

[4]    For completeness, we also mention another Seventh Circuit citation of Waffle House on EEOC issues: In re Bemis Co., Inc., 279 F.3d 419 (7th Cir. 2002). Defendant there argued that the EEOC could not pursue claims on behalf of a class of Title VII claimants because it could not meet the requirements of Fed. R. Civ. P. 23. This was the exact argument advanced and rejected in General Telephone. Judge Posner cited Waffle House as evidence that General Telephone was still good law. Id. at 422 ("Any doubt about the validity or scope of General Telephone has been laid to rest by the Supreme Court's decision . . . in EEOC v. Waffle House").

- 21 -

Dated:  April 27, 2005                          Respectfully submitted,

                                                SIDLEY AUSTIN BROWN & WOOD LLP

                                                By: _____
                                                    One of Its Attorneys

Paul Grossman                                   Gary M. Elden
Robert S. Span                                  Lynn H. Murray
Paul Hastings Janofsky & Walker LLP             Gregory C. Jones
515 South Flower Street                         John E. Bucheit
25th Floor                                      GRIPPO & ELDEN LLC
Los Angeles, CA  90071-2371                     227 West Monroe Street
(213) 683-6000                                  Suite 3600
                                                Chicago, IL  60606
                                                (312) 704-7700

665761x6

# EXHIBIT A

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison St., Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TDD: (312) 353-2421
ENFORCEMENT FAX: (312) 886-1168
LEGAL FAX: (312) 353-8555

July 5, 2000

Chief Executive Officer
Sidley & Austin
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603

     **Re: ADEA Directed Investigation**
            **EEOC Charge Number: 210A03557**

Dear Sir or Madam:

    The Equal Employment Opportunity Commission (Commission) is responsible for enforcement of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. 621, et seq. (ADEA). The ADEA protects workers over age 40 from age discrimination in such matters as hiring, promotion, discharge, compensation, demotion, and other terms, conditions, or privileges of employment.

    This is to inform you that the Commission is investigating your organization in order to determine its compliance status with the ADEA. This investigation will be conducted under the authority contained in §7 of the ADEA and in §71626.15 of the Commission's regulations. During the course of the investigation, the Commission may obtain and review relevant information and documents, tour your place of business, and/or interview management and non-management employees. At the completion of the investigation you will be informed of the disposition of the case.

    The Commission's Recordkeeping and Reporting Requirements as set forth at 29 CFR §1627.3 (b)(3) require employers to preserve all records that are relevant to an enforcement action which is commenced under §7 of the ADEA until the final disposition of such action.

    Enclosed is a Request for Information and Documents. This Request for Information does not necessarily represent the entire body of evidence which will be needed from your organization in order that a proper determination as the merits of the charge can be made. If your organization wishes to submit additional evidence which you believe will more fully support your position, please submit this evidence along with the requested information on or before **August 7, 2000**.

    We direct your attention to THE PROVISIONS OF 29 U.S.C. 626 (a) AND 15 U.S.C. 49 AND 50 OF ADEA under which this Agency is empowered to subpoena evidence necessary to its investigations. It is our hope we will receive the requested information and that it will therefore be

EEOC Charge Number: 210A03557
Page 2 of 2

unnecessary for us to resort to the subpoena process. However, unless the requested information and/or records are received by **August 7, 2000**, we will proceed under the above statute.

Please submit the requested documents to Investigator Karen Sheley. If you have any questions you may contact Ms. Sheley by her direct telephone line: (312) 886-9121.

Sincerely,

John P. Rowe
District Director

## Request for Information and Documents
## to Sidley & Austin

**Instructions and Definitions**

**Form of data produced:** Where some or all of the requested information exists in electronic form, please specify the form in which the data is kept. Where the information exists in electronic form, produce the information in one of the following forms _in addition to hard copy_:

- Fixed length or delimited text (*.TXT)
- Lotus 1-2-3 (*.WKS, *.WK1)
- Excel 3.0, 4.0, or 5.0 (*.XLS)
- Database tables (*.DB, *.DBF)
- Quattro Pro for Windows (*.WB1, *.WB2, *.WB3)
- Quattro Pro for DOS (*.WQ1)
- Quattro (*.WKQ)
- Excel 3.0, 4.0, or 5.0
- Database tables (*.DB, *.DBF)

**The Plan:** For the purposes of this Request, the **"Plan"** refers to all demotions, terminations, changes in status, and changes in the retirement policy which were decided upon, announced, or implemented or occurred at Respondent between June 1, 1999 and December 31, 1999 (the **"Period"**), including but not limited to the "series of measures" described at page 8 of Respondent's own April 5, 2000 letter "To Our Clients, Alumni, Colleagues and Friends" as follows:

> "In October, the Executive Committee adopted a series of measures designed to improve the Firm's competitive position. Press attention to those changes focus principally on the change in our retirement policy (formerly age 65 and now a range of 60 to 65) and the related change in status of approximately 20 partners to senior counsel. The press also noted that approximately 15 partners changed to counsel status."

**Documents:** "Documents," as used herein, includes tangible objects and material of every kind and description including but not limited to all written, printed, typed, microfilmed and recorded memoranda, transcribed communications, correspondence, pamphlets, books, notes, digest, logs, diaries, calendars, computer printouts, time sheets, daytimers, appointment books, photographs, tape and other recordings, disks, drives and other tangible things upon which information or data may be stored and/or any machine-readable data or electronic information or data from which any of the foregoing may be generated or produced and all non-identical copies of all of the foregoing.

**Lists or Summaries:** Lists or summaries of the requested data must be supported by copies of documents upon which the lists or summaries are based.

1.  Provide a detailed description of the organization and structure of Sidley & Austin ("Sidley").

2.  Provide a detailed description of each of the committees of Sidley which existed during the Period, including but not limited to the Management Committee and the Executive Committee. In your description, include detailed descriptions of each of the following:

    a   When the committee first came into existence.

    b.  The purpose of the committee.

    c.  The name and term of service of each member of the Management Committee and the Executive Committee from January 1, 1990 to the present, and the name and term of service of each member of any other committees during the Period.

    d.  If the members of the Management Committee and the Executive Committee are elected by persons not already members of the Management Committee and Executive Committee, then state or describe with respect to each such election since January 1, 1985:

        i.   The provisions of any governing instruments of Sidley providing for, controlling or relating to the election.

        ii.  When and where the election was conducted.

        iii. Mechanics of election (e.g., the type and timing of any notice of election, who supervised or conducted the election; whether or not by secret ballot; whether or not all votes counted equally; how, when, where and by whom the votes were counted; how, when, where, and by whom the results were announced, etc.)

        iv.  How many persons voted in the election, and their qualifications for voting.

        v    The candidates (or, if hereinafter appropriate, the proposition or question) for election, how and by whom they were nominated (or submitted for election), and the number of votes received by each.

        vi.  All minutes or records of the election and the present location thereof.

    e.  If members of the Management Committee and the Executive Committee are not elected by persons not already members of the Management Committee and Executive Committee, then state or describe how they have been selected and describe any changes in the method of selection during the period January 1, 1985 to the present.

     f.     The power or authority of the committee, and the source thereof.

     g.     Whether or not a decision or recommendation of the committee during the period from 1985 to the present has been put to a vote in an election of persons not members of the committee when the decision was made. If your answer is "yes," then state the subject matter and provide the information requested above in 2-d-i-vi.

3.     State whether any so-called "Partner" (hereinafter "Partner") of Sidley during the Period (i.e., June 1 to December 31, 1999) has ever during that Partner's entire career at Sidley voted to elect any member of the Management Committee or the Executive Committee of Sidley at a time when that Partner was not himself or herself already a member of the Management Committee or Executive Committee and was voting within the Management Committee or the Executive Committee. If your answer is in the affirmative, state the Partner's name and provide the information requested above in 2-d-i-vi with respect to the election(s) in which that Partner voted.

4.     State whether any governing instrument or document of Sidley includes any term or condition providing that Partners of Sidley, upon becoming Partners or upon adopting or consenting to the instrument or document, forever waive any right to vote upon or elect members of the Management Committee or Executive Committee of Sidley. If your answer is in the affirmative, identify the instrument or document, indicating the term or condition so providing, and produce the instrument or document.

5.     State each date, beginning with the most recent, during the period January 1, 1985 to the present upon which there was an election in which the Partners of Sidley voted with respect to each of the following subject matters:

     a.     The admission or expulsion of an individual to or from the so-called "Partnership" (hereinafter, the **"Partnership"**) of Sidley.

     b.     The hiring or promotion to Partner or termination of employment of a so-called "Associate" (hereinafter, **"Associate"**) of Sidley.

     c.     The hiring or termination of employment of significant administrative personnel of Sidley (e.g., administrative directors, financial officers, etc.)

     d.     Any change in the status of a Partner of Sidley under the Plan.

     e.     The number of units and percents and the amount of capital contribution (or withdrawal of capital) of each Partner of Sidley.

     f.     The participation in profits and in other compensation of each of the Partners of Sidley and the mix between profit and guaranteed compensation for each partner.

g.   The compensation of Associates of Sidley.

h.   Designation of heads of practice groups.

i.   Commitments in bar associations, civic or political activities.

j.   Questions of billings, including setting of hourly rates.

k.   Acceptance of new clients.

l.   Questions of conflicts of interest.

m.   Termination of relationships with previously existing clients.

n.   Relocation, opening and closing of offices of Sidley in Chicago and elsewhere and expenses in connection therewith.

o.   Expansion or contraction of Sidley, including but not limited to by acquisition of or merger with other law firms or law practices, or by divestiture or discharge of personnel.

p.   Acquiring real estate and interests therein and entering into leases and other obligations with respect to real estate (including but not limited to mortgages).

q.   Entering into contracts or agreement of any kind under which the payments due from Sidley or the potential aggregate liability of Sidley would exceed $1,000,000.00.

r.   Entering into contracts or agreements covering professional malpractice.

s.   Approving or resolving litigation in the name of or on behalf of Sidley.

t.   Retention of counsel to represent Sidley.

u.   Banking relationships of Sidley.

v.   Investment counsel relationships of Sidley.

w.   Investment of the assets of Sidley (e.g., cash, securities, etc.)

x.   Retirement programs.

y.   The Plan.

z.   Any change in the status of any Partner in accordance with the Plan.

FROM:                    FAX:                    Jul-26-00 Wed 16:27        PAGE: 00

With respect to each such election, state the subject matter thereof from the foregoing list (a-z) and provide the information requested above at 2-d-i-vi. If there were no such elections during the period January 1, 1985 to the present, state the subject matter and the date upon which the most recent such election prior to January 1, 1985 was held and provide the information requested above at 2-d-i-vi

6. With respect to each subject matter listed above in 3-a-z as to which there has not been an election in which the Partners voted since since January 1, 1985 describe by whom and how decisions regarding that subject matter were made and upon what authority any persons making such decisions acted.

7. State whether any Partner whose status was changed under the Plan attended any meeting of the persons or committees which approved or adopted the plan or was invited or permitted to address those persons or committees with respect to the Plan or as to whether there should be a change of status for that Partner under the Plan.

8. State whether either the existence or copies of the Letter of the EEOC Chicago District Office Director advising Sidley of the opening of this investigation or this Request for Information and Documents or both have been disclosed to Partners of Sidley who are not members of the Executive Committee or Management Committee. If your answer to this question is in the negative, state why not. If your answer is in the affirmative, state the number of Partners to whom such disclosure has been made.

9. Produce each so-called "partnership agreement" and all other governing instrument of Sidley in effect since January 1, 1970.

10. Produce the Plan and all documents referring or relating to the Plan (including but not limited to drafts of the Plan).

11. For each person who has been a Partner of Sidley at any time during the period from January 1, 1999 to the present, state the following:

   a.   Name.
   b.   Date of birth.
   c.   Date of hire.
   d.   Date of becoming a Partner.
   e.   Area of practice.
   f.   Hourly billing rate and changes therein from January 1, 1997 to the present.
   g.   Current title.
   h.   Aggregate number of hours and dollars billed to clients of Sidley by year for the calendar years 1997, 1998, 1999, and 2000 through June 30, 2000.
   i.   Aggregate dollars collected by Sidley to date for the billings described above in (g) indicating the amount attributable to each year's billings.
   j.   The gross amount of compensation, however, denominated received from Sidley by year in calendar years 1997, 1998, 1999, and 2000 through June 30, 2000.

FROM :     FAX :     Jul-26-88 Wed 16:27     PAGE: 03

k.   All changes in guarantees, negative guarantees, units, and percents during the period January 1, 1997 to the present, and the balances of each as of December 31, 1997 and as of each December 31 thereafter to the present..

l.   Name of any committee of Sidley upon which the person served at any time during the period from January 1, 1995 to the present.

m.   Date and reason for separation from Sidley (if applicable).

n.   Any change in status under or related to the Plan.

12.   With respect to each Partner of Sidley whose status or compensation changed under the Plan or for any reason related to the Plan, state the following:

a.   Name

b   The date the decision of Sidley with respect to the change of status was made and by whom and how it was made.

c.   The reasons for the decision to change the status.

d.   A description of the change in status.

e.   The consequences of the change in status with respect to the Partner's continuation of employment and compensation at Sidley.

f.   The date the Partner was informed of the change in status and how and by whom.

f.   Whether the Partner was requested to "consent" to the change in status and, if so, the date and by whom.

g   Whether the Partner did "consent" to the change in status and, if so, the date and how. If the Partner did not "consent," state what happened to him or her.

h.   What the consequences would have been if the Partner had not "consented" to the change in status.

i.   To the extent not fully described in answer to question 11 above, the entire compensation package of the Partner for the period January 1, 1997 to the present, indicating all changes in guarantees, negative guarantees, units, and percentages and the dates and reasons for all such changes.

13.   Produce a copy of the most recent so-called "Partnership Agreement" (hereinafter, "Partnership Agreement") of Sidley actually signed by each person who was a Partner during the period January 1, 1999 to the present, whenever that agreement may have been signed. In the event that two or more Partners signed identical agreements, you may produce the entire agreement signed by one Partner and only the signature page(s) of the identical agreements signed by the others (specifying who signed which agreement).

14.   In the event that any Partner of Sidley did not actually sign a Partnership Agreement within 30 days of the date the person became a Partner, identify that Partner and explain why.

15.   Produce a copy of every document of Sidley presented for signature to (even if signature was rejected) or signed or initialed by every Partner of Sidley whose status changed under the Plan or for any reason related to the Plan. In the event that two or more Partners signed identical documents, you may produce the document signed by one Partner and only the signature page(s) of the identical documents signed by the others (specifying who signed

which document(s)). The period covered by this request is the Period.

16.     Describe in detail all the reasons that Sidley adopted the Plan.

17     State whether Sidley relied upon the advice of counsel not a Partner of Sidley with respect to the development, adoption, or implementation the Plan. If so, identify said counsel and state how and when the counsel was selected, state how and when the advice was received and by whom on behalf of Sidley, and the general subject matter of the advice. Also state whether Sidley consulted any counsel not a Partner of Sidley even if it did not rely on the advice thereof and, if so, provide the same information.

18.     State whether Sidley received or utilized the services of any other consultant or adviser not a Partner of Sidley with respect to the development, adoption, or implementation of the Plan. If so, identify the consultant or adviser, state how and when the consultant or adviser was selected, state how and when the services were received and by whom on behalf of Sidley and describe the content of the services (including without limitation the substantive content of any advice, guidance, or counsel). Produce copies of all documents provided to any such consultant or adviser by or on behalf of Sidley and all documents received by Sidley from any such consultant or adviser.

19.     With respect to each Partner whose status changed at the time of or under the Plan or for any reason related to the Plan, state whether there were reasons independent of the Plan for the change and, if so, describe those reasons in detail and produce supporting documentation, if any such documentation exists.

20.     Explain why, in connection of the Plan, some Partners of Sidley were permitted to retain their title longer than others (e.g., until June 30, 2000) and identify who they were.

21     State whether any person has initiated litigation or other proceedings with respect to the Plan. If so, produce a copy of the Complaint or other document initiating the proceedings.

22     At page 7 of Sidley's April 5, 2000 letter "To Our Clients, Alumni, Colleagues and Friends" it is stated that "Tom and Chuck began their collaboration in the leadership of the Firm under a governance structure which allows each to continue to practice essentially full time while they address strategic/policy and operating issues, respectively." With respect thereto:

     a.     Described in detail the "governance structure" referred to and produce all documents constituting, describing, controlling, referring or relating to that governance structure.
     b.     State whether "Tom and Chuck" were elected to "leadership" by vote of the Partners of Sidley, and, if not, how they became "leadership."
     c     Describe the control which Partners of Sidley not members of the Executive Committee or the Management Committee have had and will have with respect to such "strategic/policy and operating issues, respectively" and describe in detail how that control has been and will he exercised

FROM:                         FAX:                     Jul-26-00 Wed 16:29        PAGE: 11

23. Describe when, how, and by whom the hourly rate of each attorney is established.

24. State all retirement ages which have been in effect at Sidley from January 1, 1970 to the present and the years each was in effect. Produce all documents which memorialize, discuss, refer or relate to such retirement ages.

25 State whether the retirement age has been waived for any Partner of Sidley during the period from January 1, 1970 to the present and, if so, identify the Partner and the circumstances, nature, and duration of the waiver.

26. With respect to each Partner of Sidley who retired or was retired because of the retirement age in effect at Sidley, or who retired coincident with the retirement age in effect at Sidley, during the period from January 1, 1990 to the present state the following:

    1. The name and last known address of the Partner.
    2. The date of birth of the Partner.
    3. The date of retirement of the Partner.
    4. The gross aggregate amount of compensation received annually by the Partner from Sidley during the two full calendar years prior to retirement and the gross aggregate amount of compensation received by the Partner from Sidley during the last partial year prior to retirement, if any. (Excluding any payments in the nature of retirement benefits or any other payments not constituting compensation.)
    5. The gross aggregate amount of compensation, if any, received annually by the Partner from Sidley since retirement to the present. (Excluding any payments in the nature of retirement benefits or any other payments not constituting compensation.)

27. State the policy of Sidley, if any, with respect to discrimination within Sidley on the basis of age, over 40.

28. State the policy of Sidley, if any, with respect to discrimination within Sidley on the basis of race, national origin, sex, religion, and disability status. If the policy of Sidley with respect to discrimination within Sidley on these bases is different that the policy with respect to discrimination on the basis of age, state the reasons for the difference.

29. State the policy of Sidley, if any, with respect to Partners of Sidley publicly stating on the record and for publication that Sidley deems it appropriate to and does

    1. Operate with a mandatory retirement age.
    2. Discriminate on the basis of age.

# EXHIBIT B

PaulHastings

Paul, Hastings, Janofsky & Walker LLP
555 South Flower Street, 23rd Floor, Los Angeles, CA 90071-2371
telephone 213-683-6000 / facsimile 213-627-0705 / internet www.paulhastings.com

Atlanta / Costa Mesa / London / New York / San Francisco / Stamford / Tokyo / Washington, D.C.

(213) 683-6203
paulgrossman@paulhastings.com

December 20, 2001

32873.00002

VIA FACSIMILE AND U.S. MAIL

Deborah L. Hamilton
Trial Attorney
Equal Employment Opportunity Commission
Chicago District Office
500 West Madison Street, Suite 2800
Chicago, IL 60661

Re:  E.EOC v. Sidley & Austin, Case No. 01C 9635

Dear Ms. Hamilton:

Three statements in the papers filed by the EEOC in support of its application for enforcement of
the subpoena served on Sidley Austin Brown & Wood ("Sidley") leave the reader with the
impression that a Charge of Discrimination has been filed against Sidley:

- In the Declaration of Deputy District Director, at paragraph 4a, Julianne Bowman states,
  "On July 5, 2000 the EEOC served Respondent with a notice of Charge of
  Discrimination. (Attachment 1)." Attachment 1 is a letter dated July 5, 2000 which
  informs Sidley of the directed investigation, but does not refer to any Charge of
  Discrimination.

- In the Application for an Order to Show Cause, at paragraph 3, the EEOC refers to its
  power to investigate "charges" of unlawful employment practices.

- In the Memorandum in Support of the application, at page 4, the EEOC states that it
  "received a complaint of age discrimination" from a confidential government informer
  from within Sidley.

We found these statements surprising, because Sidley has never been served with notice of any
Charge of Discrimination. If such a Charge had been filed, the EEOC would have been required
by law to provide notice to Sidley. 29 U.S.C. §626(d).

LV/7:9719 1

Paul*Hastings*

Deborah L. Hamilton
December 20, 2001
Page 2

Accordingly, please clarify this matter. If a Charge has been filed, please provide us with the
required notice, as well as an explanation of why notice was not provided previously. Otherwise,
please confirm that a Charge has not been filed, and correct the misimpression given to the Court.
Given the importance of this issue, we request an immediate response.

Very truly yours,

Paul Grossman
of PAUL, HASTINGS, JANOFSKY & WALKER LLP

LA/724719.1

**EXHIBIT C**

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
Chicago District Office

500 West Madison St., Suite 2800
Chicago, IL 60661
PH: (312) 353-2713
TDD: (312) 353-2421
ENFORCEMENT FAX: (312) 886-1168
LEGAL FAX: (312) 353-8555

December 27, 2001

**RECEIVED**

**BY FAX (213) 627-0705 AND U.S. MAIL**
Paul Grossman
Paul, Hastings, Janofsky & Walker
555 S. Flower St., 23rd floor
Los Angeles, CA 90071

DEC 2 9 2001

**PAUL, HASTINGS, JANOFSKY
& WALKER LLP**

     Re:    Sidley & Austin Investigation, No. 210-A03557

Dear Mr. Grossman,

     This letter responds to your December 20, 2001 letter addressing the question whether a "Charge of Discrimination has been filed against Sidley."

     As the EEOC's Memorandum in Support of Application for Order to Show Cause in Civ. No. 01C 9635 explains, "Acting pursuant to its statutory authority, the Chicago District Office opened a <u>directed</u> investigation of Sidley's compliance with the Age Discrimination in Employment Act ('ADEA'), including but not limited to the 1999 partner demotions and reduction in the retirement age. See 29 C.F.R. 1626.4 (1991)." Memorandum at 4 (emphasis added). *See also* Declaration of Deputy District Director in Civ. No. 01C 9635 at 2. ("Acting pursuant to its statutory mandate and in accord with its regulations, the Chicago District Office opened a <u>directed</u> investigation into age discrimination at Sidley & Austin. See 29 C.F.R. 1626.4 (1991) (emphasis added)). No partner or former partner of Sidley & Austin has yet filed a charge of discrimination based on the 1999 partner demotions and changes in the retirement age, and nowhere in its pleadings in the subpoena enforcement action does the EEOC suggest that this has occurred.

     From the beginning the EEOC has made clear that the EEOC's investigation of Sidley was proceeding pursuant to the EEOC's authority to conduct a directed investigation. The July 5, 2000 letter from the EEOC to Sidley & Austin opening the investigation indicates that the EEOC opened an "ADEA Directed Investigation"of Sidley & Austin, which was then assigned "EEOC Charge Number 210A03557." EEOC's references to the "Charge of Discrimination" cited in your December 20, 2000 letter thus refer to the charge number assigned to the directed investigation.

Because the EEOC pleadings to the Court in the current subpoena enforcement action and the EEOC's ongoing correspondence and communication with you make clear that EEOC is acting pursuant to its authority to conduct a directed investigation and not pursuant to any charge filed by any partner or former partner of Sidley & Austin, EEOC will file no clarifying document with the Court.

Sincerely,

Deborah L. Hamilton

Deborah L. Hamilton
Trial Attorney

## CERTIFICATE OF SERVICE

I, John E. Bucheit, an attorney, hereby certify that on **April 27, 2005,** I caused a true and correct copy of the foregoing Defendant's Memorandum in Support of Its Motion for Partial Summary Judgment on Claims for Individual Relief to be served via Messenger Delivery upon the following:

John C. Hendrickson
Gregory Gochanour
Deborah L. Hamilton
Laurie Elkin
Equal Employment Opportunity Commission
Chicago District Office
500 W. Madison St., Suite 2800
Chicago, IL 60661

John E. Bucheit